Good morning, Your Honors. May it please the Court, Cara DeVito for Defendant Willie Watts. My co-appellant's counsel Jerry Sisis here arguing on behalf of Mr. Karl. And, Your Honors, I'm going to try to stop before the halfway mark so that the co-counsel can address the last three issues in the opening brief. I'll be addressing the first three, beginning with the Batson jury of Wadeer. In their briefs, the parties have essentially agreed that whether or not a prima facie case had been shown was moot since the AUSA proffered his reasons for excusing jury members and because the district court went ahead to decide whether or not purposeful discrimination had been shown. And as the briefs note, there was clearly error by the district court because at a minimum there was an error in the factual underpinnings of the court's decision that there was no purposeful discrimination. That error was that one of the jurors who had been dismissed, Mrs. Connolly, juror number 45, had somehow said that she did not pay her taxes, which, of course, is untrue. A review of the record shows that all that she said was that she had a tax preparer prepare her taxes. She did not prepare her own taxes. And somehow this misinformation was perpetuated throughout the entire discussion. Are you talking now about juror 45? Yes, Mrs. Connolly. You're not talking about juror 15? It was actually juror 13, I believe, Mr. Oh, 13. Right. Okay. Actually, I would like to speak about juror 13 really quickly. The government has submitted to the Court a Rule 28J letter with an additional citation of a case that was decided in September by this circuit, the Mitchell case. The Mitchell case addresses two issues implicated by the briefs, the Batson issue and also prosecutorial misconduct. But in fact, Mitchell supports Mr. Carl and Mr. Watts' vision of what The Batson motion was made twice. The defendant was a Native American, and the first time the motion was raised was as to the striking of a Native American veneerman. The second time was as to a black veneerman. And in fact, the district court sustained the objection the first time it was raised because the Native American veneerman had said that he was uncertain about his ability to follow the law, and also he repeatedly indicated that he would be able to follow the Court's instructions even though he was uncertain. Therefore, the Court said you can't strike this juror. He has to sit on the jury if he can follow instructions, even if he is uncertain. That's clearly what Mr. Boesel's voir dire revealed. He was very apprehensive about sitting on a tax case. However, he said, I'll try. He said, I've been the foreman before on a child custody case, if it was, I'm sorry, not child custody, child support case, where clearly they were talking about financial matters. This was not an unintelligent man. He was frightened by the subject matter, but he said, I'll approach it analytically the way I do problems in my real life. I'll think about it. I'll develop a gut instinct about it. He was talking about the mechanic work that he does, which, by the way, is sophisticated mechanic work. But he said, I have an analytical process for working out problems. But all that has to be offered is a legitimate, non-discriminatory rationale by the government, and that's what they offer. They offer that he said he wouldn't even be thinking about taxes. He'd be thinking about working on cars all week because he just couldn't think about it. And isn't – I mean, you'd have to agree that that's a legitimate rationale from the government's perspective when they're trying to try a sophisticated tax case. Were I the government, yeah, I would have advanced that as a reason, absolutely. But I think there's a fine line on that kind of a rationale for excusing a juror, that they are uncertain about the subject matter and not sure they can follow it. That's what the Mitchell case says. Well, what's the evidence of pretext that you offered? As to the government's strategy? The government, the third step. Why did you – what did you offer as why that was not a legitimate reason for the government? I don't know – I don't remember where in the record it's cited, but in the opening brief, when I'm – when we went through the comparative analysis of other jurors, there were other jurors – there was at least one other juror who was concerned about the subject matter of this case and talked about how scary tax matters were. And yet it does not appear that the government used a But at any rate, even if Juror 13 was properly challenged, Juror 45 was not. And it's not just about the mistake and the error that the OUS have thought that this juror said she did not pay her own taxes. They also cited as reasons for striking this juror that she had less education than other jurors, which is not borne out by the record, that she had no prior jury experience. Well, other people with no prior jury experience were left on this jury. And most troublingly, the government said there will be people better on the jury coming up. And then we get into the whole problem of was this prosecutor trying to shape this jury, which is absolutely unacceptable. And by the way, going again to the Mitchell case, the court sustained the juror who had expressed uncertainty because that juror said he could follow instructions, but where the court overruled the Batson objection was the second time it was raised because as to the black juror who was peremptorily challenged, that juror had sat on a – that man had sat on a jury where they reached a prior acquittal and the court said that was a valid reason for challenging a juror. Nothing like that is shown by the record here. Did the court have any other questions about the Batson issue? Then I'm going to now address the insufficiency of the evidence of a single conspiracy. There are two key cases that the defendants rely on. One is U.S. v. Duran, and the other is the Kearney case. Looked at together, those two cases say that the defense believes that when a particular alleged conspiracy is not dependent upon the activities of all the members, you have multiple conspiracies and not a single conspiracy. That's Duran at 107-1. And again, they repeat later at 108-0 that typically the method of operation of a conspiracy like that has to remain constant. And finally, that each defendant has to know his benefits were dependent upon the success of the entire operation. None of those things are shown in this case. The way these defendants operated, if they did indeed engage in a unified scheme to defraud the U.S. government, this was scattershot, this was ad hoc. Different methods of dealing with the problem, if the problem was to pay taxes, arose at different points over years in time. It began with Ms. Meredith selling books and presenting her seminars, and that evolved. That evolved into, well, let's tell people to file zero-income tax returns, but not all the defendants were involved in that. Then it evolved into, let's sell them trusts. The trusts will be, in part, to avoid paying taxes to the government, but the trusts also served a legitimate purpose because they could and did act as a way of securing assets from creditors other than the tax problems. And then there was yet another aspect to this, which was opening checking accounts so that those trusts could operate as though the grantor of them still owned the property in them. None of this was constant. It was constantly evolving, and these objectives were not all dependent upon one another. The ability to sell trusts and to sell the opening of checking accounts that went with those trusts had nothing to do with whether the books sold or not. They may have been somewhat dependent upon the seminars because there was evidence that after a seminar, interest in the trusts would increase. But those trusts were being sold before any seminars were presented, and those trusts were sold throughout the year, not just when the seminars were given. In its appellate brief, the government raised an issue that this sufficiency argument may have been waived. If the Court wants, I can address that, but I believe that Mr. Carr and Mr. Watts addressed that sufficiently in their reply brief. And then finally, Your Honors, the third issue I'll address is the instructional error as to multiple conspiracies. The pattern instruction was given, but if you look at the Katiakos case, it's clear that sometimes these pattern instructions have to be tailored to the facts of the case. And here the jury was told that if it found any conspiracy at all, it had to find that one conspiracy existed, when in fact what the defendants kept arguing below, what Ms. Moore argued, which Mr. Carr expressly joined and which Mr. Watts impliedly joined because of the Court's rulings, was that there were multiple smaller conspiracies, and that the jury should have been told that, that if the jury found multiple smaller conspiracies, it had to subtract those conspiracies out before looking at the remaining evidence and determining whether there was still one single overarching conspiracy. Does the Court have any questions? Thank you. I'll turn it over to Mr. Sais now. Good morning, Your Honors. Jerry Sais for Appellant Gregory McCall. I'd like to just briefly address the FRAC 28J letter that was submitted, in which the government cites United States v. Mitchell, 502 F. 3rd, 931. And at page 2 of the letter, it makes the claim that Mitchell supports its argument that the prosecutorial misconduct was harmless in this case. Nothing could be further from the truth. First of all, Mitchell doesn't support anything on the part of the government's case. What Mitchell says is when objected to, misconduct is subject to harmless error review, while conduct to which the defendant failed to object is reviewed for plain error. That's textbook law. Nobody is contesting that. But the government says or tries to use this to show that the review should be for plain error in this case. Plain error review would be legally inappropriate in this case. The district court had previously ruled that any objection by one defendant was deemed to be an objection by all defendants. That's on page 2 of the opening brief, and there's numerous citations to the record. Mr. Watts's attorney objected in a timely fashion. Therefore, Mr. Call is deemed to have objected in a timely fashion as well. So there is no plain error review. There's harmless error review. Second, the government argues that the district court's supplemental instruction emphasizing the importance of limiting instruction adequately neutralized any prejudice that may have come from the prosecutorial misconduct. The problem with that argument is that it completely ignores the fact that Mr. Call had his due process rights to a fair trial, fair hearing, and limiting instruction violated by AUSA v. Real. And what I have to frankly tell you is one of the most egregious instances of prosecutorial misconduct, one of the most unfair things in a trial I've ever seen in my life. And what I'd like to do is get into the record a little bit with you. In the government's excerpts of record at pages 282 to 287, we have the testimony of prosecution witness Alfred Albrecht. He's from the Bank of America. And he testifies, he gives evidence that the Bank of America closed all the trust accounts opened by Mr. Call in June of 1998. On that basis, Mr. Call made a request for a limiting instruction to the court. Similar to requests that the other defendants had made, that his activity be deemed to have ceased in June of 1998, which is borne out by the prosecution testimony. And he also, at GER, government's excerpts of record, page 532, explains that the two checks that were introduced into evidence against him represented payments for opening trust accounts at Bank of America prior to June of 1998. So he makes a strong case that he's entitled to a limiting instruction. Now I turn your attention to the testimony of prosecution witness Special Agent Ereth at government's excerpts of record, pages 474 to 476. And he says, and I'd like to read this to you, just a short bit of it. He's referring to an exhibit at page GER 474, and he turns to exhibit 305. And exhibit 305 is the checks that the government has that were payable to Mr. Call. And he's asked, he's asked this for all of the defendants. And then at this point, he's asked this for Mr. Call. What's the date of the first check that this defendant received? What's the date of the last check that this defendant received? And his testimony at GER 475 is that the first check payable to Mr. Call was dated June 9th, 1995. The last check payable to Mr. Call was dated February 17th, 1998. Well, this completely supports Mr. Call's position that he's entitled to a limiting instruction cutting him off at June of 1998, because Special Agent has testified that the last check payable to Mr. Call was dated February 17th, 1998. Mr. Call should have gotten a limiting instruction. He didn't. The reason he didn't was because AUSV, AUSA V. Real, and I can't put this in any other way except to say that she lied to the court. She told the court. Kagan. That's a pretty strong. But I'm afraid that in this case it's also completely accurate. Well, tell us exactly where and how. Well, let me read to you what she said. Okay. The court asked, what was the limiting instruction? Mr. Call provided me with one. And AUSA V. Real says yes. His proposed limiting instruction, I believe, had a withdrawal date from the conspiracy sometime in June of 1998. Where are you reading from, please? I'm sorry? Where are you reading from, please? What page in the record are you on? GER 536, starting with line 3 and going down to line 15. What was the limiting instruction? Mr. Call provided me with one. AUSA V. Real says yes. His proposed limiting instruction had a withdrawal date from the conspiracy sometime in June of 1998. Because that's when, according to him, B of A stopped opening the accounts. Well, it's not according to him. It's according to Alfred Obrecht, the employee and representative of B of A. And he didn't say that they stopped opening the accounts. He said they closed all the accounts that Mr. Call had opened. And although B of A did stop opening accounts at that point in time, his involvement continued. We have checks to him as late as checks to chess enterprises as late as March of 1999. Well, here's the problem. They don't have checks to him as late as March of 1999, because Special Agent Erath has already told us that the most recent, the latest check that they have is February of 1998. Based on the representation, the false representation that AUSA V. Real made to the district court, the district court ended up not giving a limiting instruction for Mr. Call. Mr. Watts got one, but Mr. Call did not get one. Mr. Call's position is that by not getting a limiting instruction, his due process right to a fair hearing and fair trial was violated. He was legally entitled. He should have gotten a limiting instruction. He was entitled to it. He didn't get it. And the reason he didn't get it was because the prosecutor misrepresented the testimony of her own witness to the court. Okay. Now we come to the rebuttal closing argument. And in the rebuttal closing argument, AUSA V. Real makes reference to a collective they to all the defendants, and she lumps into that Mr. Watts and Mr. Call. And she refers to conduct that took place in 1999. The problem with that is neither one of them were part of the conspiracy in 1999. In terms of Mr. Watts, the district court had already given a limiting instruction, and AUSA V. Real simply ignored it. Did you object at the time or ask for a limiting instruction at the time from Mr. Call? I'm sorry. Did you object at the time or ask for a limiting instruction at the time for Mr. Call during trial? Mr. Call asked for a limiting instruction, and his request was denied. Okay. His request was denied based on the representation of AUSA V. Real that they had this check dated as late as March of 1999, which they didn't have. Now we go to the rebuttal closing. And in the rebuttal closing, AUSA V. Real makes reference again to conduct that took place after the cutoff in terms of both Mr. Watts and Mr. Call. Now, at the end of this, and before the rebuttal closing started, the judge had made it clear that he was giving a standing objection. And Mr. Watts' attorney, Mr. Tanninson-Lippo, even made a point of asking, does that mean that nothing is waived, that we can wait until the end of the closing argument and then raise our objections? And the court said yes. So that's exactly what happened. After the rebuttal closing was over, attorney Tanninson-Lippo, who was representing Mr. Watts, presented this objection to the court that AUSA V. Real had wrongfully attributed conduct past the cutoff date to Mr. Watts. And, of course, that objection is deemed to be applicable to Mr. Call as well because a long time before, the Court had repeatedly ruled that an objection by one is deemed to be an objection by all the defendants. So this was timely. This was a timely objection. Now, what happened with that objection was that the district court said it didn't remember exactly what AUSA V. Real had said. And it asked her, and she said, I didn't say that. I was just quoting from this book. Counsel, you're going to need to wrap up because you're out for your time. Sure, sure. I'm sorry. The point is, she did say that. She misrepresented what she had said to the jury, to the court. So not only did she misrepresent to the jury in a rebuttal closing that Mr. Watts and Mr. Call were liable for activity that they were not liable legally, as a matter of law, were not liable for, but then when she was called on it and the court asked her, she denied having done it. Now, the court was remiss. The court should have gone through the record and checked, and it would have seen that she had, in fact, done that. The court didn't do that. But it doesn't change the fact that Mr. Watts and Mr. Call's due process rights to a fair hearing and a fair trial were violated. All right. Thank you, counsel. Thank you. May it please the Court. Ilana Artsin on behalf of the United States. And I'd like to begin with the issues of prosecutorial misconduct that Mr. Cice was discussing and with some of the facts that were raised for the first time and issues that were raised for the first time in the defendant's reply brief. Now, the claim here has to do with three statements that were made by the prosecutor during the rebuttal argument based on limiting instructions that the district court gave. And the background of those limiting instructions is as follows. In approximately August of 1997, Mr. Watts, another co-defendant who was not before the court at this point, Ms. Erickson, and the government's cooperator, Tony Smith, all went out, left Meredith's organization, and formed their own competing organization to do exactly the same thing. And there was evidence introduced concerning some of the activities that had occurred in that competing later business. In response to that affirmative separation from the Meredith organization, the district court gave a limiting instruction with respect to Mr. Watts and Ms. Erickson that the activities and evidence relating to the period of time after they formed their own organization, which in Mr. Watts' case was August 1st of 1997, and I believe in Ms. Erickson's case it was September of 1997, based on the last checks they had received from the Meredith organization, that that subsequent evidence could only be used against each of those defendants, but could not be used against other defendants, and vice versa. In Mr. Carl's case, he did request such a limiting instruction, but the district court determined that it was not appropriate as a matter of law that whether he withdrew from the conspiracy was something that was a factual matter that both sides could argue to the jury. The basis for that, when the government argued against this limiting instruction, there were two reasons given. One was that the government had checks through March of 99, which reflected referral payments that had been made to Carl. And the second... The facts suggest, having reviewed the government's evidence, the government did have checks through 1999 to Mr. Carl. In fact, it did not introduce the 1999 checks. It only introduced checks through 1998. So while the government did have that evidence in possession, the prosecutor was mistaken about whether that was in evidence. However, the second fact that the prosecutor referred to is that, in fact, there was no evidence that Mr. Carl separated himself from the conspiracy, because as late as 2001, and we've cited the record site in our footnote, Mr. Carl was still being referred to by Meredith as a CPA we work with. And the basis for that was that one of Mr. Carl's major roles here was to procure these so-called felt-house letters, which were letters that were used by the defendants to mislead their customers into thinking that these pure trusts had no tax requirements. In fact, it is true that the pure trust itself had no tax requirement because it was a sham, but that doesn't mean that there was no tax owing. It just means that either the grantor or the beneficiary or somebody owes that money, but not the trust, because the trust itself is a sham. And the evidence at trial demonstrated that the defendants knew this, Mr. Carl was a CPA, Mr. Watts was a CPA, and that their role was to obtain these letters to try and mislead their customers. Those letters continued to be used through 2001, and Mr. Carl never made any effort to, well, withdraw from the conspiracy in the sense of somehow eliminating this thing that he had set in motion. And through 2001, these documents continued to be reprinted in all of Meredith's literature. And we've cited an exhibit called Protecting Your Assets from Vultures. These were in the How to Cook a Vulture and the various, quote, vultures books that Meredith put out. So there was a factual basis to argue that, in fact, Mr. Carl, unlike Mr. Watts, did not affirmatively separate himself from the conspiracy. And even if one of those facts was incorrect because the government did not introduce the 1999 checks and evidence, there was a factual basis for the government to argue that this was a factual issue for the jury. In any event, the district court determined that there was not an affirmative withdrawal and that a limiting instruction would not be given as to Mr. Carl. So we would submit that these misconduct claims really do not apply to him. They only apply to Mr. Watts. There are three specific exhibits that are objected to, and of those I would submit that there is only one that is even potentially problematic, and that is Exhibit 35, which is a trust application that was dated after the date that Watts had left Meredith's organization. Now, in discussing that exhibit, the prosecutor did not specifically refer to Watts or to any other defendant. She referred generically to the defendants and the fact that all of the defendants, as part of this scheme, tried to tout the legitimacy of these trusts by saying that they had been reviewed by lawyers and CPAs. Immediately before this statement, there was a reference to Watts, and after the discussion of this exhibit, there was specific reference to Watts and to other exhibits, particularly Exhibit 296, that showed that Watts himself was touting these credentials. When the issue was raised after closing argument and the prosecutor said, well, that particular discussion, I was not referring to Watts, I was referring to the defendants generally, the district court indicated that was also how the district court had heard that part of the argument. We have a cold record. That's why we have to defer to the district court. The district court was there. That's how the district court heard that argument. We would submit that the prosecutor did not intend to violate the limiting instruction. The district court did not hear that as a violation of the limiting instruction. But even if it were construed as referring to Watts, any error would be harmless, because there was abundant evidence, aside from that particular exhibit, that all of these defendants, and particularly Mr. Watts, did indeed tout his credentials as a CPA in order to try and advance the legitimacy of this scheme. And we've summarized some of that evidence, most particularly that we had three victim witnesses who testified that during the course of the sales presentations, Mr. Watts said that he was a CPA, and that was a fact that they considered in deciding to purchase this trust. We've also indicated that there was a form trust document that was used. During the time that Watts was there, all of the trusts were a form document that just had certain things filled in. And on that form document, Watts was listed as the head of the pure trust department of Sovereignty Pure Trusts, and as an inactive CPA. So every one of these trusts that he sold, the document itself, had that representation on it. And the form also stated that Sovereignty Pure Trusts could provide a board of directors, which consisted of an attorney, an inactive CPA, and an executive secretary. And, of course, the only inactive CPA that would be referred to would be Mr. Watts. So there was abundant evidence, aside from that particular exhibit, which made the same point, as well as the overwhelming evidence we've indicated in our brief of Mr. Watts' participation in this scheme. So we would submit that even if there was any error with respect to Exhibit 35, in the context of the entire trial, it was harmless. Let me just briefly touch on the other two exhibits, and then I want to move on to the Batson issue. Exhibit 296 was a letter that related to this subsequent business that Erickson, Watts, and Smith set up. Ms. Smith testified that she received that letter from Watts, so it was clearly something that he had knowledge of, and was properly used against him because it related to his conduct. And finally, there was a third comment which related to a comparison of the 1994 and 1999 editions of Vultures and Eagles Clothing. And I would point out that this objection was never raised at trial. The other two documents were objected to. This objection was never raised at trial, so at least this issue should be reviewed for plain error. And essentially what that comes down to is the fact that the back cover of both of these documents, of both of these books, had essentially the same back cover with the same bullet points. The prosecutor read the bullet points from the 1999 version, but they were the same bullet points in the 1994-1995 version during the time when both of these defendants clearly were in the conspiracy. So we would submit that that was an argument that was made, again, relating to all of the defendants and the continuing scheme that ran over a long period of time. Let me, with my remaining ten minutes, turn to the Batson issue and why the Court did not clearly err in finding that the defendants failed to show purposeful discrimination. Initially, I would note that although we have two jurors we have discussed, the record seems to reflect that the Batson challenge was actually only made as to Juror 45. There was not a Batson challenge made after the government challenged Juror Number 13. The information concerning Juror Number 13 came up in the course of discussing whether there was a prima facie case as to Juror Number 45, and that is proper. It is certainly proper to consider the government's previous actions in determining whether there was a prima facie case, as well as once we passed that step in looking at Step 3. But I didn't see in the record that there was specifically a challenge to Juror Number 13. In any event, even if there was, we would submit that there was certainly no purposeful discrimination shown there. The standard is the totality of the circumstances, and we would submit that the totality of circumstances here overwhelmingly demonstrates that there was no racial discrimination. First of all, and maybe most significantly, there was simply no motive in this case to keep blacks off the jury. This is not a case in which there were any racial overtones. Only one of the seven defendants was black. The others were all Caucasian. This is a tax case. There simply was no racial overtone here that would give a prosecutor such a motive. Secondly, the prosecutor volunteered an explanation for his strikes, which is a factor that the Supreme Court in Hernandez indicated suggests a lack of discriminatory intent. And third and most importantly, we have to look at the overall pattern of challenges, and this is what is referred to as a comparative analysis. What I would point out is that I think that the defense only does half of the comparative analysis here, because what they do is they look at Juror Number 45, and then they look at other jurors who were seated. But if we look at the four reasons that the prosecutor gave, which were that there were better people coming up, that this juror was less educated than some of the people who didn't pay their taxes, that she had no prior jury experiences, and that she did not pay or prepare her own taxes, a number of those reasons applied to many jurors. And the government only has six peremptory challenges. So to say that there were seated jurors who had no prior jury experience is not really a valid statistical analysis, because the government only had six challenges. What is more significant in this case is that the government's challenges were all exercised in a consistent manner, consistent with the questions that the government had asked the jurors during its 10 minutes of allotted voir dire. So four of the five jurors that the government challenged were jurors who used tax prepares. All of the jurors the government challenged had jobs indicating that they were not highly educated, and four of the five jurors lacked prior jury experience. And again, this was consistent with the fact that during its allotted voir dire, the government spent the bulk of its time talking to jurors about their understanding of tax, whether they used tax prepares, what their educational level was. But what's the significance of whether they used tax prepares or not? What the government's going after is a more sophisticated jury. Sophisticated people use tax prepares. This is unsophisticated. And that may be. And that's why what the court, what one of the things that this court and the Supreme Court has said is we can't look at whether you think that this is strategically a smart move. The question is, is the prosecutor's explanation believable? Now, what I would submit in this case, and I was not the prosecutor who tried this case, but the prosecutors believed that a juror who prepared his or her own taxes would have more familiarity and more comfort than somebody who just gave the materials to somebody else and said, you do it and I'll sign it. Now, whether that is a smart strategic judgment or not is not the appropriate inquiry under Batson. The issue is, is it believable? And here we would submit that it is believable because it's an area that the government explored extensively during its voir dire and then exercised its challenges in a consistent manner to challenge jurors who had used tax prepares because it wanted people who had some sort of personal experience, I guess, with the tax system. The question is, is that credible? It is credible because the Supreme Court and this Court have repeatedly recognized that when non-minority jurors are challenged for the same reason, that undermines any claim of bias. And that's exactly what the record here showed. I think each one of these reasons are borne out by the record. When the government said, you know, there are better people coming up, well, in fact, the next jurors were a financial planner who had been the foreperson of a jury, a software engineer, an investment advisor. Again, the question is not, is it a good strategy, but it was the government's strategy, as the district court recognized, to try to choose sophisticated jurors. Were the other jurors less educated? All of the jurors the government challenged were people who had, you know, let's say clerical or blue-collar-type jobs. Again, the question is not, is this the right strategic judgment, it's, is it believable or is it a pretext for race? Four of the five jurors also had no prior jury experience. So what we really come down to is this last issue, and that is that the prosecutor said, juror number 45 did not pay her own taxes, when, in fact, what she said is that she did not prepare her own taxes. What is the significance of that discrepancy in light of all of the other circumstances in this case which overwhelmingly indicate that there was not racial discrimination? And here, I think that there are two Supreme Court cases that are helpful in assessing whether the district court clearly erred in finding somehow that that one fact was not sufficient to outweigh all of the other facts. The first is Miller v. Dretke, which is a habeas case in which the Supreme Court did actually overturn a State court finding. There, the prosecutor's reason also misstated the juror's answer. And in finding that there was an issue of pretext, what the Supreme Court pointed out is that as soon as the prosecutor was called on his mistake, he didn't try to defend it. He immediately abandoned it and moved on and claimed some other reason for challenging the juror, which in the Supreme Court's view reeked of pretext. Exactly the opposite happened here. The prosecutor, the first time he was asked, said, I challenged this juror because she didn't pay or prepare her own taxes, and because she was somewhat less educated than some of the other people who hadn't paid their own taxes. When he was called on it, he said, we've been analyzing this, we've made notes on it, this is why I challenged her. That was very strong evidence before the district court that this was not pretext. This was a reason that was important to the government, and whether it was strategically correct or not, it was not a pretext. So we would submit that's one important case to think about. And the other is Rice v. Collins, which while it has been pointed out is a habeas case and there's greater deference owed in a habeas case, even on direct appeal, there is deference owed to the district court. The standard here is clear error. And if the conclusion of the district court is plausible, it must be upheld. In Rice v. Collins, we had an issue where the prosecutor gave several reasons, one of which is that the juror rolled her eyes in response to a question by the district court, and the court said, I didn't observe that behavior. But there were two other reasons that were borne out by the record that were plausible, that were race neutral, and the court said that's sufficient. And I think the important point that the Supreme Court made here is to say, you know, the prosecutor provided other plausible reasons. The district court or the trial court observed the prosecutor. And therefore, we can't say that the fact finder was unreasonable in concluding that or somehow the only plausible conclusion was that she must have lied about the eye rolling because the court didn't see it. And I think that's the situation we have here. The district court couldn't remember exactly what had been said about taxes. But that is not the issue. The issue is, was this prosecutor using this as a pretext? And there is simply nothing here to suggest that it was pretext, because the tax issue was consistent with the thrust of the government's challenges, and because all of the other reasons given by the prosecutor were clearly borne out by the record and because all of the surrounding circumstances indicate that there was simply no basis here to believe that the prosecutor had a motive or in any fashion had been engaged in discrimination for which this was a pretext. There is also some dispute in the record, but certainly there was another black juror who was on the jury at the time that number 45 was challenged. We think that the record shows that that juror was still there at the time the jury was seated, and that is also a factor that this Court can consider. So when you look at the entire record, in my last one second, I would simply submit that the district court did not clearly err in believing the prosecutor's explanation and finding that the defense had failed to carry their burden at the third step of showing purposeful discrimination. All right. Thank you, counsel. Well, counsel, you already went over by three minutes. We'll give you one minute. Great. Report is transferred for April 24, 2004, page 242. The Court, Mr. Cantalupo has objected on behalf of Mr. Watts. The Court says, I'm not entirely clear on the argument. Do you know what Mr. Cantalupo is referring to? He says, to the ACA v. Real. And she says, I believe he's referring to the quote in the Vultures and Eagles Clothing book that I read, or the application that I read, that each of our pure trusts is customized and looked at by attorneys, CPAs, and paralegals. I certainly did not refer to any particular CPA. I was referring generally that there were CPAs, legitimate CPAs and attorneys that had approved. That's what she said to the Court. Here's what she said to the jury. It's in the opening brief, the bottom of page 85. With respect to Willie Watts, he primarily sold trusts and acted as a trustee. He touted his credentials as a CPA in order to lend legitimacy to this scheme. Take a look, for example, at Exhibit 35, which is the Stephen Carter trust application. In the application, under the printed form, the defendants represented to people whose trust is customized, and on and on and on. She's specifically referring to Willie Watts by name. All right. So what she told the Court was simply not accurate. All right, counsel, we understand your point. Thank you very much. The United States v. Carl Watts will be submitted, and this Court will adjourn for this session. Thank you. All rise. This Court, for this session, stands adjourned.
judges: Thompson, Wardlaw, Ikuta